[Cite as *In re N.Q.*, 2013-Ohio-3176.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

IN RE: N.Q., D.C., H.C. and D.F.


Appellate Case Nos. 25428


Trial Court Case Nos. JC2009-10396
  JC2009-10398
  JC2009-9915
  JC2009-9917


(Civil Appeal from Common Pleas
 Court - Juvenile Division)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 19th day of July, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
    Attorney for MCCS-Appellee

DARYLE C. TIBBS, Attorney Reg. No. 0085935, 19201 Reed Hartman Highway, #213, Cincinnati, Ohio 45242
    Attorney for P.F.-Appellant

DAWN GARRETT, Atty. Reg. No. 55565, 7865 Paragon Road, Suite 107, Centerville, Ohio 45459-4027
    Attorney for Minor Child H.C.-Appellee

Representative for PAUL GILBERT, Atty. Reg. No. 10129, 58 Cider Mill Way, Tipp City, Ohio 45371
    Guardian ad Litem for Minor Children - N.Q., D.C., H.C. and D.F.

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}     Appellant, P. F., appeals from a judgment terminating her parental rights and granting permanent custody of her minor children, N.Q., D.C., H.C., and D.F. to the Montgomery County Children Services (MCCS).[1]  P.F. contends that MCCS failed to prove by clear and convincing evidence that it made diligent efforts to reunify the children with her.  P.F. further contends that MCCS failed to prove by clear and convincing evidence that reunification is not possible within a reasonable period of time.

{¶ 2}     We conclude that the record contains sufficient clear and convincing evidence that an award of permanent custody to MCCS is in the best interests of N.Q., D.C., H.C. and D.F., and that they cannot be placed with either parent within a reasonable time or should not be placed with either parent.  Accordingly, the judgment of the trial court will be affirmed.


I.  Facts and Course of Proceedings

{¶ 3}     In early November 2009, MCCS filed a complaint for abuse and dependency, alleging that P.F.'s minor child, D.C., had a large bruise on his forehead and a laceration on his finger, and that P.F. had no explanation for the injury.  D.C., who was a little over two years old, had been admitted to Children's Medical Center due to possible abuse.  D.C. was also below normal height and weight for his age, suggesting failure to thrive, and he appeared developmentally delayed.  The complaint indicated that P.F. had said that she was unable to care for her children due to her mental status, that she had gone to Miami Valley Hospital on October

---

[1]  For privacy purposes, we will use the initials of Appellant and the children.

30, 2009, to be admitted for mental health problems, and that she had been referred to Crisis Care. P.F. reported crying daily and had hit herself over the head with a B.B. gun. P.F. had four children, including D.F. (male, d.o.b. 1/8/2002); H.C. (female, d.o.b. 7/4/2005); D.C. (male, d.o.b. 5/9/2007); and N.Q. (female, d.o.b. 1/8/2009). At the time the complaint was filed, P.F. was twenty-two years old.

{¶ 4} Dependency complaints were filed regarding the three remaining children, and MCCS was granted temporary custody of all four children in November 2009. The children were then placed in foster care.[2]

{¶ 5} Care House monitored the case for the first several months, and then MCCS caseworker, Sherree Spence, took over in February 2010. Spence met with P.F., and made sure that she had a copy of the case plan that Care House had prepared. Spence also prepared another case plan, with the same objectives, and gave it to P.F. The elements of the case plan were explained to P.F. many times. They included: (1) obtaining and maintaining stable and legal income and housing; (2) completing a drug and alcohol assessment and following all recommendations; (3) having a parenting/psychological assessment, and following recommendations, particularly regarding past abuse so that it does not interfere with the ability to parent her children; (4) visiting the children on a regular basis consistently; (5) providing relatives who could possibly take care of the children; and (6) obtaining domestic violence education.

{¶ 6} The drug and alcohol assessment was a concern because P.F. had admitted to

---

[2] The complaints and orders of custody were filed on various dates in November 2009, but the time frames are irrelevant for purposes of this appeal.

regular marijuana use. In this regard, MCCS made two referrals. The first was to Crisis Care in November 2009. After an assessment, Crisis Care sent P.F. to Day-Mont for treatment. P.F. was supposed to get group therapy twice a week for mental health and drug treatment. She was also supposed to have an individual session once a month. P.F. attended two group sessions in November, seven in December, and one on January 4, 2010, during which she had a panic attack and had to be escorted out of the group. She did not return to Day-Mont after that.

{¶ 7} When P.F. spoke with Spence in April or May 2010, P.F. said that she was still engaged in services at Day-Mont. However, this was untrue, as Day-Mont informed Spence that P.F. had not been seen since January 2010. P.F. also had three drug screens at Day-Mont – one in November 2009 and two in December 2009. The first and third screens were positive for THC.

{¶ 8} In April 2010, MCCS referred P.F. to Dr. Richard Bromberg for a psychological and parenting assessment. Bromberg clinically interviewed and psychologically tested P.F. on April 26, 2010. The tests and checklists that Bromberg administered included: the Personality Assessment Inventory; the Substance Abuse Subtle Screening Inventory; the Parenting Stress Index; the Axis II Personality Checklist; and the Child Abuse Potential Inventory (CAPI). Bromberg also gave P.F. a parenting questionnaire and conducted a mental status examination.

{¶ 9} P.F. told Bromberg that she had marijuana in her system at the time of their interview. She also said she had been involved with MCCS three times previously – twice about physical abuse of her children, and once regarding an incident in which one of the children was left at a mental institution with her.

{¶ 10} P.F. stated that she had never been employed and that her stepfather took care of

her completely. In addition, she said she had experienced panic attacks since the age of nine, which is when Children Services took her away from her own mother due to physical abuse. P.F. made serious suicide attempts by cutting herself at ages 11, 14, and 16, and was treated for panic attacks and depression at Grandview Hospital at age 18. P.F. also told Dr. Bromberg that she had been diagnosed as bi-polar, and had out-patient treatment at Miami Valley Hospital at age 20.

{¶ 11} Furthermore, P.F. reported daily mood swings and said that the most minor thing could make her snap. She said she could be violent, and that when her emotions would get "messed up," she could have blackouts, which would involve her destroying things, putting holes in walls, and ripping down doors. P.F. also reported anxiety and rated both her anxiety and depression at a very high level – nine out of a possible 10.

{¶ 12} Subsequently, Bromberg observed P.F. during a visitation with the children. He noted that two children had real difficulty during the visitation, and some of the children were not responsive to P.F.'s attempt to set limits. Based on the tests, interview, and observations, Bromberg diagnosed P.F. as having bipolar disorder, cannabis abuse, anxiety disorder, and a somatization disorder, which was a preoccupation with her health conditions and pain. Bromberg concluded that P.F. was in a serious mental state and needed a great deal of assistance. He also noted that she showed a high level of stress, anxiety, paranoia, and personality disorder, and fit the criteria for having a substance abuse disorder.

{¶ 13} In addition, P.F. scored 200 points higher than the 164 point cutoff score of the CAPI. This test represented P.F. as someone who was really in the "danger zone" when around children. Bromberg stated that the high cutoff score, together with the additional tests he

performed, presented concern over P.F.'s reunification with the children, as related to child abuse.

**{¶ 14}** Dr. Bromberg made the following recommendations for P.F.: (1) evaluation by a psychiatrist for use of psychotropic medication; (2) individual counseling for 12 to 24 months; (3) outpatient drug treatment and active involvement in two to three Alcoholic Anonymous or Narcotics Anonymous meetings per week; (4) random drug testing; and (5) parent education classes. Bromberg expressed concern over P.F.'s ability to pay attention or to participate in parenting classes due to problems with concentration, ability to focus, and patience.

**{¶ 15}** In April 2010, Spence also referred P.F. to the Consumer Advocacy Model (CAM) program, which was a dual-diagnosis program. P.F. first went to CAM in mid-June 2010 and began treatment in July 2010. Drug and alcohol counseling was recommended, and P.F. was scheduled for group work once a week and for individual counseling once a week. There were three levels that P.F. was supposed to complete, which would normally take five to six months.

**{¶ 16}** Both P.F. and her counselor described her attendance at CAM as "sporadic." At the time of the custody hearing, P.F. still had 16 to 17 weeks remaining before she could possibly complete her treatment program. If P.F. had consistently attended treatment, she would have been done by the time of the hearing. P.F. gave various excuses for failing to attend, including that she was not feeling well, was "running late," or did not have transportation. Both CAM and MCCS provide bus tokens, but P.F. refused to ride the bus, telling her caseworker that her ex's family hated her and was gang-related. She was afraid that his family would see her and kill her.

{¶ 17}  During her own testimony, P.F. denied being afraid of people who are in gangs. She testified that she didn't like the environment on the bus, and that other people from her past, being younger, did not like her.  She also said she often saw the man against whom she had filed a protection order.  However, P.F. later admitted that she had seen him only once on the bus, two or three years previously.

{¶ 18}  At the final custody hearing in April 2011, P.F. admitted that she had used marijuana pretty consistently since her children entered foster care in November 2009.  While in the CAM program, P.F. had two clean urine scans in August and September, 2010, but thereafter, drug tests were positive, and P.F. also acknowledged using marijuana.

{¶ 19}  P.F. saw a psychiatrist at CAM and was prescribed Zoloft and Trazodone to help with her anxiety, sleep, and depression.  MCCS was waiting for P.F. to complete substance abuse treatment with CAM before referring her for further mental health treatment, because she could not receive treatment from two different providers at once. However, P.F. never progressed beyond the initial stage of the three stages of substance abuse treatment.

{¶ 20}  MCCS felt that domestic violence education was important because all of P.F.'s significant relationships had been violent toward herself or her children.  MCCS referred P.F. to Artemis sixteen times for domestic violence education, but P.F. never went.  The education involved as little as four weekly classes, and could have been completed in a month.  P.F. did not sign up for the classes because she did not think she needed them.  She also stated that signing up always "slipped" her mind, and that she would sign up if she could just remember. Trial Transcript, Volume III, p. 473.

{¶ 21}  Regarding the case plan objective of consistent visitation, P.F. was scheduled for

two hours of visitation per week. She was required to show up for visits one hour early because several visits had either begun late or were canceled very late, or P.F. simply did not show up at all. There were also issues with P.F.'s mother, who drove her to visits. P.F.'s mother was obviously under the influence of some kind of substance and had difficulty walking and standing upright. Because of this issue, MCCS ultimately had to ban P.F.'s mother from its grounds. When the caseworker, Spence, told P.F. that her mother would have to leave, P.F. began screaming and became hysterical at the visitation center, stating that Spence could not tell her that her mother could not attend visits, and that her mother would be there whether Spence liked it or not.

{¶ 22} In addition, P.F. spent most of her time at visits with the older two children, H.C., and D.F. P.F. demonstrated a lot of animosity toward her older daughter, H.C., and spent a lot of time yelling at her and calling her names. P.F. was also very adamant about demanding physical affection from her children and having them tell her that they loved her. When H.C. refused, P.F. would become very upset with H.C., calling her a traitor, stating that she didn't love H.C., and that H.C. was not her child. Trial Transcript, Volume II, p. 269. Spence described P.F. as being frequently overwhelmed during visitation, and as having problems with supervising, acknowledging, and bonding with the children.

{¶ 23} The visitation department conducted a visitation assessment between March and May 2010. On the first visit, Mindy Norris, a social program specialist, was present for the last 40 minutes. During this time, P.F. spent the last half-hour cleaning. This was consistent during every visit. P.F. included the older children in the cleaning, but ignored the younger children. She also complained in front of the children about the foster families. In addition, P.F. broke

out in loud, exuberant song at almost every visit, which did not appropriately fit some situations. Norris also noted that P.F.'s mood was changeable, switching from being energetic and happy to suddenly scolding and telling one of the children that his sister was "mean." *Id*. at p. 214. Norris also indicated that P.F. had acknowledged that the two younger children were not very bonded to her.

{¶ 24} With regard to the objective of maintaining stable and legal income and housing, P.F. had lived in subsidized housing for about three or four years. At the time of the custody hearing, a paramour was living with her, which would jeopardize her ability to stay in Dayton Metropolitan Authority Housing. P.F.'s rent was $25 per month, which her step-father paid. This amount of rent resulted from temporary employment that she had for a few weeks as a waitress, but she lost that job because the other waitresses were against her (according to P.F.). P.F. could have had her rent decreased to zero, but she failed to contact the housing authority to let them know that she was again unemployed. She was also barred from the Job Center for a year, beginning in June 2010, because she failed to let them know that her children were not living with her.

{¶ 25} P.F.'s only source of income was from her step-father, who paid for her rent, groceries, phone bill, and other expenses. The step-father told MCCS's caseworker that he was struggling to maintain his household and P.F.'s as well.

{¶ 26} P.F. had only completed her education through the eighth grade, and was 23 at the time of the final custody hearings. She had never held a job, other than the brief job as a waitress, and had failed to obtain her GED, despite being referred by MCCS. P.F. went to a GED orientation, but left because her anxiety prevented her from staying in a room with multiple

people for four hours.

{¶ 27}  At the custody hearing, P.F. admitted telling Dr. Bromberg that she could get violent when her emotions were "messed with."  For example, she said that she had attempted suicide in front of her boyfriend and best friend, after learning that he had cheated on her with the friend.  At the time of the suicide attempt, her infant son, D.F., was present in his crib.  P.F. stated that:

> I have a tendency to prove my point to people through violence * * * because I feel like I'm the stronger one.  So I know I would have gone to jail if I cut one of them, so I can't go to jail if I cut myself, so that's what I proved to them.  I did it in front of them and to prove a point * * * .  Trial Transcript, Volume III, p. 509.

{¶ 28}  Finally, with regard to the case plan objective of providing relatives who were suitable for caring for the children, the known biological fathers of the children either refused to establish paternity or did not desire contact with the children.  P.F.'s step-father was investigated for possible placement, but he had a criminal conviction which made it inappropriate for him to care for the children.  A non-relative of D.F. was also investigated, but her criminal record also eliminated her for placement.  P.F. never gave the agency names of possible placements.

{¶ 29}  The children were doing well in their foster-care placements, and the agency believed they were all adoptable.  D.C., the child who had been physically abused, had been with the same foster parent for seventeen months.  When D.C. was hospitalized before going into foster care in November 2009, he had paper plates and feces in his digestive system, in addition

to having been physically abused. When the foster mother picked D.C. up from the hospital, he was withdrawn, was very pale, and would not smile. She was told that he was likely a dwarf because of his size. D.C. was only 32 inches tall and weighed only 25 pounds at 18 months of age. Seventeen months later, D.C. weighed 45 pounds and was 42 inches tall. He was average size for his age and was very talkative.

{¶ 30} Parenting classes were not a specific case objective, but were recommended by Dr. Bromberg. MCCS did not implement parenting classes until September 2010 (and then only at the request of P.F.'s attorney), because the agency was waiting until P.F. was capable of paying attention and participating.

{¶ 31} MCCS indicated that P.F. had not completed most of her case plan objectives, and that the agency did not believe that she could complete her objectives in a reasonable amount of time. MCCS also indicated that the agency did not believe P.F. would be able to parent her children in a reasonable amount of time, and that an award of permanent custody to the agency was in the best interests of the children.

{¶ 32} In September 2010, MCCS filed motions seeking permanent custody of the children. The trial court then appointed counsel for P.F., and appointed a guardian ad litem (GAL) for the children. Subsequently, in late October 2010, the GAL filed a motion, asking the court to order an independent mental evaluation of P.F. by Dr. James Barna. In addition, the GAL moved to dismiss the permanent custody motion, based on the alleged unconstitutionality of R.C. 2151.414.

{¶ 33} After the trial court ordered an independent mental evaluation, Dr. Barna administered the following tests to P.F.: (1) the Minnesota Multi-Phasic Personality Inventory-2

(MMPI-2); (2) verbal reasoning tests from the Wechsler Adult Intelligence Scale; and (3) the CAPI test (the child abuse potential test that had already been administered by Dr. Bromberg). Dr. Barna also received Dr. Bromberg's report as well as Bromberg's computer-generated reports and scoring profiles.

{¶ 34} In addition, Dr. Barna observed P.F. during several visitation sessions at the visitation center. During the first visitation, Barna stayed only 20 minutes because P.F. was distraught. Barna left a message with the MCCS caseworker indicating that P.F. was "out of control," and that he was not going to be able to stay to supervise the visit that day. Trial Transcript, Volume II, p. 276.

{¶ 35} Barna was not able to interpret P.F.'s CAPI test results because she appeared to be adopting what is called a "fake-good" approach to the test. The MMPI-2 results for the second half of the test were also invalid. Barna concluded that the results of the intelligence test indicated that P.F. had average verbal reasoning intelligence. He, therefore, concluded that if P.F. possessed such reasoning scores, she had the capacity to learn whatever she needed to parent her children. He further stated that P.F. had "at worst" intermittent mild depression, and that she had "the requisite capacity to parent her biological children." Defendant's Ex. A, p. 15.

{¶ 36} During his report and testimony, Dr. Barna spent the majority of his time criticizing Dr. Bromberg's testing and evaluation. Barna testified that he did not recall telling the State's attorney on February 11, 2011, that P.F. was not doing very well. He also did not recall telling the MCCS caseworker that P.F. was out of control, although he did recall that she was very distraught and that he left the visitation session early as a result.

{¶ 37} Barna attached no clinical significance to the prior diagnosis of bipolar disorder.

He also did not know that P.F.'s treatment for panic attacks and depression six years earlier were significant issues. Barna further ascribed no importance to P.F.'s self-report of panic attacks and that the smallest things made her snap. In addition, Barna did not administer a substance abuse test because he felt that P.F.'s described use of marijuana was recreational. Finally, Barna found no evidence of paranoia despite P.F.'s high score on the paranoia index.

{¶ 38} Barna concluded that any elevation in P.F.'s paranoia score was solely caused by the involvement of MCCS. In checking the results for the MMPI-2, Barna noted which paranoia-related questions had been marked true. Barna then asked P.F. what the particular response referred to. When P.F. said that her response had referred to MCCS, Barna eliminated the response. Barna indicated that when he eliminated those responses, P.F.'s paranoia score was within a normal range. Barna admitted that the manual for the MMPI-2 does not provide for reading questions to patients.

{¶ 39} As an additional matter, Barna contradicted himself during his testimony. He first said that he was not aware of the bipolar disorder diagnosis when he wrote his report. He then stated that he was aware of the bipolar disorder diagnosis before he wrote the report. Trial Transcript, Volume II, p. 380. The magistrate also noted on the record at one point, that Barna was yelling when he was being cross-examined by the State. *Id.* at pp. 393-394.

{¶ 40} Finally, in response to a question from the trial court about what "capacity to parent" means, Barna said it meant that P.F. could adequately parent her children, but needed help. Barna stated that "She's got too many children too close. You give them to her right today, it's going to be a disaster." *Id*. at p. 450.

{¶ 41} At the conclusion of the hearing, the GAL recommended a second extension of

temporary custody in order to implement parenting classes and Dr. Barna's recommendations. The magistrate then filed a decision granting permanent custody of the four children to MCCS.

{¶ 42}   Both P.F. and the GAL filed objections to the magistrate's decision. Subsequently, the trial court overruled the objections, concluding that the children could not be placed with either parent within a reasonable period of time or should not be placed with either parent.   The trial court further found that a grant of permanent custody of the children to MCCS was in the best interests of the children.   P.F. appeals from the judgment granting permanent custody to MCCS.

II.   Did MCCS Fail to Prove Diligent Efforts

to Reunify the Mother and Children?

{¶ 43}   P.F.'s First Assignment of Error is as follows:

The Agency Failed to Prove by Clear and Convincing Evidence that It Provided Diligent Efforts to Reunify the Children With Mother.

{¶ 44}   Under this assignment of error, P.F. contends that MCCS failed to prove by clear and convincing evidence that it made diligent efforts to reunify P.F. with her children. According to P.F., MCCS made it impossible for her to reunify with her children by placing stipulations on visitations, by refusing to provide referrals for parenting classes, and by requiring case plan objectives that had no relationship to why MCCS initially became involved.   P.F. also argues that she complied or substantially complied with her case plan objectives.

{¶ 45}   R.C. 2151.414(B)(2) provides that a trial court "shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section

that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest."

{¶ 46} In the case before us, the trial court concluded that the children could not be placed with either parent within a reasonable time, or should not be placed with either parent, based on R.C. 2151.414(E)(1). This part of the statute provides that:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 47} The trial court noted that MCCS had made diligent efforts to provide services and referrals, and that P.F. had failed continuously and repeatedly to substantially remedy the conditions causing the children's placement outside the home. In particular, the court stressed P.F.'s failure to complete outpatient treatment at Day-Mont and CAM, her continuous use of marijuana throughout her involvement with MCCS, and her failure to complete parenting classes.

**{¶ 48}** The record supports the trial court's conclusion. The problems that initially caused the children to be placed outside the home were P.F.'s admission that she could not take care of the children due to her mental health problems, and the condition of D.C., who was significantly undernourished and appeared to have been physically abused. According to P.F., one of the other children had been physically abused previously by the child's father. P.F. stated that she was the one who took the blame for the abuse. No matter who abused the children, P.F., at a minimum, failed to protect them from harm.

**{¶ 49}** The case plan objectives – which included obtaining stable and legal housing and income, drug and mental health assessments, domestic violence education, consistent visitation, and parenting/psychological assessments – were directly related to these issues. Despite having been afforded substantial assistance and many referrals for treatment, P.F. failed to make even minimal progress toward resolving the issues that caused the children to be removed. In fact, some things, like domestic violence education, she simply refused to do. P.F.'s ongoing issues with violence, in addition to the matters already mentioned, included an incident in November 2010, when she reported to her caseworker that she had gotten into a fight and had sustained a broken collarbone and bruises.

**{¶ 50}** The stipulations on visitation were caused by P.F.'s failure to appear at visitation, or to appear in a timely manner. Furthermore, the time stipulation was not an undue restriction – the agency simply required P.F. to appear an hour before visitation was to begin, so that the agency, foster parents, and children could be assured that she would be present. There was no reason for the children to be subjected to the stress of appearing for visits that their mother failed to attend. MCCS also acted reasonably in barring P.F.'s mother from visitation,

because she was under the influence of some type of substance during visitations.

{¶ 51} In addition, MCCS did not refuse to provide P.F. with referrals for parenting classes. The testimony indicates that P.F. was unsuccessful throughout the case at attending any group activity. She also lacked the attention span required to participate. There was no reason to believe that she would be able to participate in parenting classes, but MCCS scheduled them anyway, at P.F.'s request. Furthermore, by her own admission at the hearing, P.F. had not attended any parenting classes and had missed recent appointments for parenting classes because she was allegedly looking for some other kind of provider. Thus, even though P.F. was given an opportunity to attend parenting classes, she made no effort to do so.

{¶ 52} As an additional matter, Dr. Bromberg indicated that the first thing that needed to take place was for P.F. to stop taking marijuana, because this impacted everything else. However, P.F. continued to consistently use marijuana, even up to the time of the custody hearings.

{¶ 53} The remainder of P.F.'s discussion in connection with this assignment of error focuses on her compliance or substantial compliance with case plan objectives. We have thoroughly reviewed the record and find no support for P.F.'s position. Accordingly, the First Assignment of Error is overruled.

III. Did MCCS Fail to Prove by Clear and Convincing Evidence
that Reunification is Not Possible Within a Reasonable Period of Time?

{¶ 54} P.F.'s Second Assignment of Error states that:

The Prosecution Did Not Prove by Clear and Convincing Evidence that

Reunification With Mother Is Not Possible Within a Reasonable Period of Time.

**{¶ 55}** Under this assignment of error, P.F. contends that MCCS failed to prove that she lacked capacity to provide adequate parental care. In this regard, P.F. focuses on the differing opinions of the two expert witnesses. Specifically, Dr. Barna testified that P.F. had the capacity to parent her children. He also suggested staggered visitation and participation in parental skill building. Dr. Bromberg's opinions have already been discussed.

**{¶ 56}** "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶ 57}** In the case before us, the triers of fact were the trial judge and magistrate, who were both aware of Dr. Barna's testimony. The magistrate, who heard the witnesses, specifically found Dr. Bromberg's testimony credible and did not rely on Barna's testimony. After reviewing the objections to the magistrate's decision, the trial court noted Barna's opinion, but also stressed Barna's statement that giving the children to the mother right away would be a disaster.

**{¶ 58}** The trier of fact is " 'in the best position to weigh the evidence and evaluate the testimony.' " *In re C.C.*, 10th Dist. Franklin Nos. 04AP–883, 04AP–884, 04AP–885, 04AP–886, 04AP–887, 04AP–888, 04AP–889, 04AP–890, 04AP–891, and 04AP–892, 2005-Ohio-5163, quoting *In re Brown,* 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). (Other citation omitted.)

**{¶ 59}** " 'Weaknesses in the factual bases of an expert's testimony go to the weight and credibility of the expert's testimony * * *.' " *In re G.K.*, 9th Dist. Summit Nos. 24276, 24278, 2008-Ohio-5442, ¶ 12, quoting *Dejaiffe v. KeyBank USA Natl. Assn.*, 6th Dist. Lucas No. L-05-1191, 2006-Ohio-2919, ¶ 19. The Sixth District Court of Appeals also observed in *G.K.* that:

> [O]nce expert testimony is properly before the trial court, the "burden falls on the opposing party to discredit or minimize the expert's testimony through cross-examination." *Johnson v. Knipp* (1973), 36 Ohio App.2d 218, 220, 304 N.E.2d 914. It then becomes the role of the trier of fact to assess the expert's credibility and to assign weight to the expert's testimony and opinions. (Citations omitted.) *Id*.

**{¶ 60}** In the present case, the trial magistrate and trial court were not required to believe Dr. Barna's testimony. Evidence in the record supports the decision to accord little weight to Barna's testimony, including the fact that he contradicted his own testimony and the fact that a good deal of his test results were invalid.

**{¶ 61}** We have previously concluded that the agency made diligent efforts to reunify P.F. with the children. Furthermore, the fact that an individual may have sufficient intelligence to comprehend child-rearing principles does not mean that the person is, therefore, capable of properly assimilating and employing them. The testimony at trial indicates that P.F. was redirected many times with respect to things that she should be doing during visitation, like paying attention to all her children, attending to their needs, and so forth. However, she was never able to adequately assimilate instructions. She continued to make the same mistakes, and

also belittled her children, calling them names like "traitor" when they failed to do what she wished.  The testimony clearly indicated that P.F. had no idea how to parent her children and was overwhelmed by simple tasks. There was no indication, after a year and a half of little to no progress, that she would ever be able to effectively parent the children.

**{¶ 62}**    Accordingly, the Second Assignment of Error is overruled.


IV.   Is Granting Permanent Custody to the Agency

in the Best Interests of the Children?

**{¶ 63}**    P.F.'s Third Assignment of Error is as follows:

The Grant of Permanent Custody Is Not in the Best Interests of the Children.

**{¶ 64}**    Under this assignment of error, P.F. contends that MCCS failed to prove that permanent custody is in the best interests of the children based on the factors in R.C. 2151.414(D).

**{¶ 65}**    R.C. 2151.414(D) provides, in pertinent part, as follows:

(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through

the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 66} After considering R.C. 2151.414(D), the magistrate concluded that granting permanent custody to MCCS was in the best interests of the children. The trial court agreed. P.F. contends on appeal that MCCS failed to present evidence that she met any of the factors in R.C. 2151.414(E)(7)-(11). As a result, she contends that MCCS did not clearly and convincingly prove that permanent custody to the agency is in the best interests of the children.

{¶ 67} This particular issue was not raised in P.F.'s objections to the magistrate's decision. Instead, P.F. generally objected to the determination that permanent custody was in the best interests of the children, and supported her objection by citing parts of the record that

contained statements of the two eldest children about whether they wanted to be with their mother. *See, e.g.*, Case No. 2009-10398, Supplemental Objections of P.F. To Magistrate's Decision and Judge's Order Granting Motion for Permanent Custody, Doc. # 21, pp. 10-11.[3] Accordingly, we conclude that P.F. waived this argument, absent plain error. *See, e.g.*, *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 14.

{¶ 68} In *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), the Supreme Court of Ohio held that:

> In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. (Citations omitted.) *Id.* at syllabus.

{¶ 69} The circumstances of the case before us do not present a situation where the plain error doctrine should be applied. The factors involved in R.C. 2151.414(E)(7)-(11) involve matters such as whether a parent has been convicted of feloniously assaulting a sibling or other child who lived in the parent's household; whether the parent has withheld food or medical treatment when the parent had means to provide the food or treatment; whether the parent has abandoned the child; or whether the parent has previously had parental rights involuntarily terminated. If such evidence had been presented, it would have militated in favor

---

[3] The record includes documents filed in separate cases for each of the four minor children, but the relevant pleadings are essentially the same. For purposes of convenience, we have referred to the objections in D.F.'s case.

of awarding permanent custody to the agency. The absence of such evidence is, at best, a neutral factor and would not have assisted P.F. Consequently, any error in this regard would have been harmless.

{¶ 70} In arguing that granting MCCS permanent custody is not in the children's best interests, P.F. also points to the following: (1) testimony that her visitations were inconsistent until she had reliable transportation in December 2010; (2) her own testimony that she is bonded with her children; (3) the fact that D.F. wants to return to her, that H.C. is ambivalent, and that two of the children are too young to express their wishes; and (4) the fact that adoption of the children is not guaranteed.

{¶ 71} The Eighth District Court of Appeals has consistently held that "only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights." (Citations omitted.) *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 56. We have followed a similar approach. *See In re R.L.*, 2d Dist. Greene Nos. 2012CA32, 2012CA33, 2012-Ohio-6049, ¶ 18 (noting that "[n]ot every statutory condition must be met before a determination regarding best interest may be made."). The case before us presents more than one reason for terminating parental rights, as both the magistrate and trial court concluded that custody to the agency was in the children's best interest under all four factors set forth in R.C. 2151.414(D)(1)(a)-(d).

{¶ 72} Because the trial court is clothed with substantial discretion in making decisions on the best interests of the children, "the proper standard for review of that decision is abuse of discretion." *In re K.H.,* 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. After reviewing the record, we find no abuse of discretion.

{¶ 73} The trial court was not required to credit P.F.'s testimony about her bond with the children. Instead, the court noted that P.F.'s interactions with the children had generally not been positive, that throughout her involvement, visitation was sporadic, that P.F. had called her child names like "traitor," and that P.F. seemed completely overwhelmed by the children during visitation and had to be constantly reminded to attend to and acknowledge all the children. The children were also doing very well in foster care. R.C. 2151.414(D)(1)(a). Evidence in the record supports these findings. Furthermore, the children had been in the temporary custody of MCCS from November 2009 through April 2011 (the date of the final custody hearing), or for a period of approximately seventeen months – thus qualifying under R.C. 2151.414(D)(1)(c).

{¶ 74} With regard to R.C. 2151.414(D)(1)(b), which refers to the children's wishes, only two children were old enough to express a preference. Only one of these children, D.F., who was the eldest, expressed a preference for staying with his mother. However, the trial court could properly have chosen to accord little weight to D.F.'s preference, given P.F.'s criticism and attempts to influence the children against their foster families. For example, P.F. was observed complaining in D.F.'s presence about the foster families and D.F.'s appearance. As another example, an incident occurred during a different visitation, when H.C. gave D.F. a piece of candy, and D.F. cried because he wanted more. P.F. stated to H.C. in D.F.'s presence: "Why don't you give him more candy; what is wrong; you didn't use to be like this before foster care; you are a totally different child than you were before you went into foster care." Trial Transcript, Volume II, p. 225.

{¶ 75} Finally, regarding the possibility of adoption, the Tenth District Court of Appeals has noted that "[n]othing appears in the current version of R.C. 2151.414(D) that would

indicate the trial court must consider the probability that the child will be adopted before granting permanent custody." (Citations omitted.) *In re A.S.*, 10th Dist. Franklin Nos. 05AP–351, 05AP-352, 2005-Ohio-5492, ¶ 6. Although the statute has since been amended, the reference in R.C. 2151.414(D)(1)(d) to a "need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency," has remained unchanged. The legislature has not chosen to add a requirement of probability of adoption before granting custody.

{¶ 76} The Tenth District Court of Appeals also correctly observed that "[a]doption into a secure, safe environment, whether it be with [the foster parent] or any other family, cannot take place without [the agency] first gaining permanent custody * * *." *Id.*

{¶ 77} The evidence before the trial court indicated that the children are adoptable, and that the foster parents of three of the children had expressed interest in adopting them. The fourth child, D.F., had been recently transferred to a different foster home, but he was bonded with that family and adored his current school. In addition, the evidence indicated that no appropriate placements, other than those associated with permanent custody, existed.

{¶ 78} In light of the foregoing discussion, the trial court did not err in concluding that granting MCCS permanent custody is in the best interests of the children. Accordingly, the Third Assignment of Error is overruled.

### V. Conclusion

{¶ 79} All of P.F.'s assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH and HALL, JJ., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Daryle C. Tibbs
Dawn Garrett
Representative for Paul Gilbert
Hon. Anthony Capizzi