[Cite as *In re R.S.J.*, 2021-Ohio-1332.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: R.S.J.

:
:
:     Appellate Case No. 28825
:
:     Trial Court Case No. 2017-0902
:
:     (Appeal from Common Pleas
:     Court – Juvenile Division)
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of April, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Appellee, Montgomery County Children Services

MARK A. FISHER, Atty. Reg. No. 0068686, 5613 Brandt Pike, Huber Heights, Ohio 45424
     Attorney for Appellant, T.L.

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, T.L., appeals from the juvenile court's judgment denying her motion for legal custody of her great-grandson, R.S.J., and granting permanent custody of the child to Appellee, Montgomery County Children Services ("MCCS").[1]  Mother also filed an appeal, but we granted her motion to dismiss it.  *See In Re R.S.J.,* 2d Dist. Montgomery No. 28809 (Decision and Final Judgment Entry, Aug. 20, 2020).  Father did not appeal from the judgment terminating his parental rights.

{¶ 2} According to T.L., the juvenile court should not have granted permanent custody to MCCS because it was not in the child's best interest.  Instead, the court should have given T.L. a chance to work with the agency to obtain legal custody of R.S.J.  T.L. further contends that the court's decision to overrule her motion for legal custody was unsupported and was contrary to the child's best interest.

{¶ 3} For the reasons stated below, we find no error on the juvenile court's part. Consequently, the judgment of the juvenile court will be affirmed.

## I.  Facts and Course of Proceedings

{¶ 4} This case has a long history, beginning with injuries to an older sibling of R.S.J.  Mother's history with MCCS began in November 2015, when MCCS received a referral from Dayton Children's Hospital ("Children's") regarding Mother's son, B.F., who had been brought to the hospital with multiple bruises on his head and face, marks on his neck that were suspicious for strangulation, and other injuries, including a torn frenulum.

---

[1] To protect the child's privacy, we will refer to his parents as "Father" and "Mother" and to the child as "R.S.J."  We will also use initials for other family members.

Transcript of Proceedings ("Tr."), p. 94-95. At the time, B.F. was about 18 months old. Tr. p. 94. Because of the physical abuse allegations, Melissa, an MCCS employee who worked at CARE House as a special investigations intake caseworker, conducted an investigation. *Id.*

{¶ 5} Melissa talked to Mother more than a dozen times. At first, Mother denied that her boyfriend at the time (Father) would have hurt her son. B.F. was not Father's biological child. Tr. p. 96. Mother reported that the night before they came to the hospital, she and B.F. had stayed the night at Father's home, and she had put B.F. to bed in his playpen. When she got up at around 8:30 a.m., B.F. was outside the playpen, and she noticed bruises. After leaving the house and returning about an hour later, Mother found that B.F. was crying and had a "busted lip." *Id.* Father also had "busted knuckles" on his hand. *Id.* During the investigation, the police and Melissa saw text messages on Mother's phone from Father, stating, " 'Don't take the child to the hospital for treatment and put something around him so that they wouldn't be able to observe the bruising.' " Tr. p. 100-101.

{¶ 6} Previously, in October 2015, B.F. had been to Children's for treatment, based on concerns that he was falling and had other bruising on his body. After B.F. was discharged on that occasion, he was set up for outpatient treatment. However, Mother failed to cooperate and take B.F. to those appointments, so he was discharged from the program. Tr. p. 100.

{¶ 7} Given these facts, MCCS had concern over Mother's ability to protect B.F. While he was hospitalized, testing previously done at his primary care physician showed elevated liver enzymes; according to the doctors, this indicated some type of abuse or

trauma. In addition, Mother did not report any of the history and did not share that B.F. had prior injuries. Tr. p. 102. MCCS was concerned about the fact that B.F. had all these bruises on his body, but supposedly there were no bruises the day before. *Id.*

{¶ 8} On November 19, 2015, Father was arrested on charges of felonious assault and child endangering. State's Ex. 1, p. 2. B.F. was released from Children's on November 23, 2015, to B.F.'s maternal great aunt and uncle on a safety plan. Tr. p. 104. On December 15, 2015, MCCS filed an abuse, neglect and dependency complaint concerning B.F. *Id.* at State's Ex. 1. The complaint noted that B.F.'s own biological father was currently incarcerated on murder charges. *Id.*

{¶ 9} In January 2016, the case was transferred from Melissa to an MCCS caseworker, Frances. Tr. p. 106 and 109. When the case was transferred, Mother told Melissa that she was still in a relationship with Father, which was concerning because he was a suspect in the injuries to B.F. Tr. p. 103. Because Mother was still in a relationship with Father and had not sought a protection order against him, she was considered not to be cooperating with MCCS. Tr. p. 104.

{¶ 10} When Frances received the case, MCCS was concerned over Mother's ability to appropriately and adequately parent B.F. due to Mother's past relationships with violent offenders and B.F.'s current bruises. Tr. p. 109. At that point, B.F.'s father, D.F., was in juvenile detention for murder, and Father was suspected of having abused B.F. Tr. p. 109-110. When Frances received the case, she talked to Mother about these concerns, including that the serious injuries inflicted on B.F. were the biggest concern, and that Father should not have access to B.F. Tr. p. 110. At that time, Mother said she did not want any contact with Father and had not had any contact with him other than

him contacting her.   Tr. p. 111.

{¶ 11} In February 2016, B.F.'s father, D.F., was convicted of aggravated assault and voluntary manslaughter, and was sentenced to 11 years in prison.   *See* State's Exhibit 4, p. 1.

{¶ 12} On March 15, 2016, B.F. was adjudicated a dependent and neglected child, and the maternal aunt and uncle were given temporary custody.   Their custody was set to expire on December 9, 2016.   *See* State's Ex. 2.   Part of the order was that there would be no contact between Father and B.F.   *Id.* at p. 1.

{¶ 13} Between January and August 2016, MCCS worked to reunify B.F. with Mother.   Tr. p. 111.   During that time, Mother completed parenting classes that included discussion of appropriate relationships.   She also completed the other items on the case plan concerning a parenting and psychological evaluation, maintaining employment and housing, and signing releases.   Tr. p. 113-114.   In addition, Mother had visitation with B.F., beginning with two-hour visits twice a week, and then increasing to extended visitation and overnights.   Tr. p. 115.

{¶ 14} During this time, Mother repeatedly denied having contact with Father and denied being in a relationship with him.   Tr. p. 119-120.   Announced and unannounced visits to Mother's home also did not reveal that anyone was living with Mother.   Tr. p. 120-121.   After a hearing on August 16, 2016, the juvenile court filed an order giving Mother legal custody of B.F., with MCCS retaining protective supervision that would expire on February 15, 2017.   State's Exhibit 3, p. 2.

{¶ 15} Sometime around August 2016, Frances became concerned when Mother finally told her that she was pregnant.   At the time, Mother was about seven months

pregnant. Tr. p. 122. When Frances asked who the father was, Mother lied and gave her the name of "Dakota Sargent." *Id.* Mother claimed she did not have contact information and that Dakota had said he did not want to be involved with the baby when he found out Mother was pregnant. Tr. p. 122-123. Although Frances attempted to locate Dakota on her own, she was unsuccessful, as she did not have a birthdate or any identifying information. Tr. p. 123.

{¶ 16} After learning Mother was pregnant, Frances became even more adamant in asking about Father, but Mother continued to deny having a relationship with him, and there was no evidence to the contrary. Tr. p. 124-126. When Frances visited Mother both announced and unannounced, there was no evidence of a male living there, no visible marks on B.F., and Mother was appropriate with B.F. Tr. p. 126.

{¶ 17} In early November 2016, Mother gave birth to R.S.J. and named the baby after Father. Tr. p. 129 and State's Exhibit 8. When MCCS learned this, the agency was concerned because Father had harmed B.F. before and was facing charges for those injuries. Tr. p. 129. When Frances asked Mother about the relationship, Mother admitted that she had concealed it because the caseworker would have not have let B.F. come home if she had known. Tr. p. 132. After that, Frances continued to speak with Mother about Father, and Mother continued to deny that they were in an ongoing relationship. Mother also acknowledged that Father should not have contact with B.F. Tr. p. 132-133. Mother kept saying that Father was not around B.F., that B.F. was not being left with Father at any time, and that she would only have R.S.J. visit with Father outside her home at the paternal grandparents' home. Tr. p. 130 and 132.

{¶ 18} Again, when Frances made announced and unannounced visits to Mother's

home after R.S.J.'s birth, there was no indication that anyone else was living there.   Tr. p. 130.   As noted, MCCS's protective supervision was to end on February 15, 2017.   After protective supervision ends in its cases, MCCS makes a final visit to the home.   Tr. p. 133.   However, the visitation for Mother never occurred, because on February 13, 2017, B.F. sustained a serious head injury and was transported to Children's.   He died the following day of injuries that Father allegedly caused.   State's Exhibit 8 and Tr. p. 21-22 and 134.   Up to that point, Mother had continued to say that Father was not having any contact with B.F.   Even at the hospital when B.F. was seriously ill, Mother denied to three different caseworkers that Father was in the home.   Tr. p. 134.

{¶ 19} B.F. died on February 14, 2017.   The police had begun a criminal investigation and, on that day, they removed R.S.J. and placed him in MCCS's custody. *Id.* at State's Exhibit 8.

{¶ 20} On February 15, 2017, MCCS filed a dependency complaint regarding R.S.J. and requested temporary custody.   *Id.*   The same day, the court held a hearing, during which Mother agreed to give interim custody to MCCS.   The court then gave MCCS interim temporary custody, ordered Mother to have no contact with Father, and scheduled an adjudication and dispositional hearing for March 29, 2017.   The court also appointed a guardian ad litem ("GAL") for R.S.J.   R.S.J. was placed with a foster family and has remained with the same family the entire time he has been in care.   Tr. p. 7.

{¶ 21} On March 22, 2017, MCCS assigned the case to James, who was still the ongoing caseworker at the time of the permanent custody hearing in May 2019.   Tr. p. 22.   On March 29, 2017, the court filed an order finding R.S.J. dependent and granting MCCS temporary custody.   The custody order was set to expire on February 15, 2018,

unless the agency made a motion to extend before that date. Additionally, the court ordered that Mother was not to have contact with R.S.J. outside supervised visitation.

{¶ 22} On March 29, 2017, the GAL filed a Report and Recommendations. See GAL Report (Mar. 29, 2017). The GAL noted that B.F.'s death was suspected to have been caused by R.S.J.'s father, who had been spending the night in the family home a couple of times per week, despite the fact that he was not supposed to be around B.F. due to a protective order. *Id.* at p. 1. The GAL further expressed concern about Mother's ability to protect R.S.J. from harm due to the circumstances of the case, which included Mother's lack of concern about B.F.'s welfare and the fact that she did not seem to grasp the severity of his injuries in the recent incident. *Id.* at p. 3. The GAL recommended that R.S.J. be adjudicated dependent and that MCCS be given custody because Mother failed to protect B.F. from harm. *Id.* In addition, the GAL expressed concern about Mother protecting R.S.J. from potential abusers and noted that criminal charges against Mother were still a possibility. *Id.*

{¶ 23} Mother's case plan included cooperating with the criminal investigation; following all court orders; completing a parenting/psychological assessment and following all recommendations; completing a mental health and/or substance abuse assessment and complying with all recommendations; attending parenting classes and domestic violence education classes to learn methods surrounding supervision and protection; maintaining housing and income and providing supporting documentation of income and lease for housing; signing releases of information; and completing a visitation assessment. Case Plan, p. 2.

{¶ 24} In a semi-annual administrative review ("SAR") filed on June 5, 2017, MCCS

noted Mother's report that she had been referred for mental health therapy and had started attending two to three weeks previously. SAR (June 5, 2017), p. 3. Father had been incarcerated since February 14, 2017, and had established paternity for R.S.J. *Id.* At that time, MCCS was conducting a home study for Mother's brother, T.H. *Id.*

{¶ 25} In June 2017, M.S.J., the paternal grandmother, and T.L., the paternal great-grandmother, each filed pro se motions to intervene in the case, and a hearing was set for September 12, 2017. MCCS filed a memorandum in opposition to the motions on July 25, 2017.

{¶ 26} On July 28, 2017, an indictment was filed in the Montgomery County Common Pleas Court charging Father with two counts of murder (proximate result); felonious assault (serious physical harm); endangering children (abuse-serious physical harm); involuntary manslaughter; and child endangerment (serious harm), based on the injury and death of B.F. *See* State's Exhibit 6.

{¶ 27} On August 9, 2017, MCCS filed a motion asking that Mother's visitation be modified from supervised to monitored. At that time, the caseworker, James, indicated by affidavit that the supervised visits were going well.

{¶ 28} At the GAL's request (due to a scheduling conflict), the September 2017 hearing on the motions to intervene and to modify visitation was continued until October 31, 2017. The GAL then filed another report on October 31, 2017. GAL Report (Oct. 31, 2017). In this report, the GAL noted that he had visited the home of T.L. (paternal great-grandmother). M.S.J., the paternal grandmother, had also been present. *Id.* at p. 2. During the visit, both T.L. and M.S.J. indicated they were unsure whether Father had actually harmed B.F. *Id.* at p. 3. In the same report, the GAL noted that Mother was

opposed to T.L. and M.S.J. having visitation and said that they had not been involved with R.S.J. when she had custody. *Id.*

{¶ 29} The GAL recommended that the motions to intervene be denied. The GAL stated that he was concerned about T.L.'s and M.S.J.'s having visitation, as they had been aware of Father's being around the deceased child and the stipulation requiring him to stay away. The GAL further stressed that they were complicit in allowing Father to be around the deceased child, and that one could not expect them to protect R.S.J. when they had failed to protect B.F. *Id.* at p. 4. In addition, the GAL opposed granting custody to Mother's brother (T.H.), as Mother's motive was to see the child away from the agency and the GAL did not think Mother should have unsupervised visitation. *Id.* The GAL was also concerned about Mother's veracity, as she had lied to everyone about Father's exposure to the deceased child. *Id.* at p.5.

{¶ 30} Following the hearing, the court denied the motions to intervene and also denied the transfer of custody to Mother's brother. Magistrate's Decision and Order, p. 2-3. Subsequently, on January 8, 2018, T.L. filed another motion to intervene, and MCCS filed a memorandum the next day, which again opposed the motion. On January 9, 2018, the court granted MCCS's motion for a first extension of temporary custody, extending the order until August 15, 2018, and it dismissed T.L.'s motion to intervene.

{¶ 31} On March 16, 2018, T.L. filed another motion to intervene, as well as a motion for temporary custody and visitation. After a hearing on April 18, 2018, the court denied both motions. T.L. then filed objections to the decision on May 4, 2018, and supplemental objections in June 2018.

{¶ 32} A SAR filed in late May 2018 indicated that Mother had been "fairly

consistent" with visits and that she needed to address her protective capabilities in therapy.   SAR, Case Review (May 2018), p. 3 and 5.   MCCS then filed a motion and affidavit on June 19, 2018, seeking a second extension of temporary custody; a disposition hearing was set for October 2, 2018.   This hearing was continued twice and eventually was set for January 18, 2019.   In the meantime, on December 5, 2018, the court sustained T.L.'s objections and granted her motion to intervene.

{¶ 33} The GAL Report filed before the January 18, 2019 hearing revealed that the GAL was still not convinced reunification with Mother was in R.S.J.'s best interest.   In this vein, the GAL commented that "Mother has a history of making poor choices, which led to the death of a sibling, so I do not view case plan completion as justification for reunification."   GAL Report (Jan. 2019), p. 4.   On January 18, 2019, the court granted a second extension of custody to MCCS, and MCCS then filed a motion on January 28, 2019, asking the court to grant it permanent custody of R.S.J.   The court set a permanent custody hearing for February 12, 2019.   Ultimately, the hearing was held on May 7, 2019.

{¶ 34} In the meantime, both Father and T.L. filed motions for legal custody in late March 2019.   In his motion, Father asked the court to grant legal custody to T.L.   The GAL then filed a report on May 7, 2019, reaffirming the concerns expressed in his last report.   GAL Report (May 7, 2019), p. 3.   The GAL recommended that the court grant permanent custody to MCCS, noting again that he was not convinced that reunification was in the child's best interest.   In this regard, the GAL again stressed Mother's history of poor choices, leading to B.F.'s death, and noted that he did not view completion of a case plan as justification for reunification, as Mother had also completed her prior case plan before being reunified with B.F.   *Id.*

{¶ 35} Concerning the motions for legal custody, the GAL stated that he was opposed to them based on concerns mentioned in prior reports. *Id.* Specifically, the GAL commented that "[T.L.] was complicit in allowing Father around the deceased sibling. This fact raises concerns about [T.L.'s] ability to protect R.S.J. from harm." *Id.*

{¶ 36} At the May 7, 2019 hearing, the magistrate heard testimony and admitted exhibits concerning the agency's motion. In a decision filed on July 2, 2019, the magistrate granted permanent custody of R.S.J. to MCCS. Magistrate's Decision and Judge's Order. In addition, the magistrate overruled the legal custody motions of T.L. and Father. Mother, Father, and T.L. then all filed objections to the magistrate's report. All parties asked for permission to file supplemental objections after the transcript was filed, and the court agreed, allowing them 30 days to file supplemental objections after the transcript was filed.

{¶ 37} The transcript was filed on August 22, 2019, and both Mother and Father timely filed supplemental objections. However, T.L. did not file supplemental objections. On October 21, 2019, MCCS timely filed a response to the supplemental objections.

{¶ 38} A few days later, T.L. filed a motion for extension of the time to file her supplemental objections. The juvenile court denied the motion, noting that the other objecting parties had timely filed their objections, and that T.L. had waited to ask for an extension for more than 30 days after her time for filing supplemental objections had expired. Judge's Order, p. 1. As a result, the court found a lack of good cause for the extension. *Id.*

{¶ 39} On May 12, 2020, the juvenile court overruled the parties' objections, granted MCCS permanent custody of R.S.J., and denied the motions for legal custody.

Judge's Final Appealable Order (May 12, 2020).

{¶ 40} Mother appealed from the judgment on May 26, 2020, and her appeal was docketed as Montgomery App. No. 28809. T.L.'s notice of appeal was filed on June 10, 2020, and her appeal was docketed as Montgomery App. No. 28825. However, in July 2020, Mother moved to withdraw her notice of appeal, which we granted. *R.S.J.*, 2d Dist. Montgomery No. 28809 (Decision and Final Judgment Entry, Aug. 20, 2020). We also ordered that the summary of docket and journal entries filed in Mother's appeal be transferred to T.L.'s appeal. *R.S.J.*, 2d Dist. Montgomery No. 28825 (Order, Aug. 25, 2020).

{¶ 41} Some further delay was occasioned by a show cause order issued to T.L. for failure to file a brief, and extensions then given to T.L. for filing her brief. T.L.'s brief was filed on February 8, 2021, and the State responded on March 1, 2021. The matter, therefore, is now ready for resolution.

II. Abuse of Discretion in Granting Custody Motion

{¶ 42} T.L.'s First Assignment of Error states that:

The Trial Court Abused Its Discretion in Granting MCCS's Motion for Permanent Custody.

{¶ 43} Under this assignment of error, T.L. contends that the juvenile court should not have granted permanent custody to MCCS, but instead should have allowed T.L. an opportunity to work with MCCS for placement of legal custody. Before we address this matter, we must consider the fact that T.L. failed to raise any specific objections to the magistrate's decision. Specifically, T.L.'s initial objection was a one-page document that

simply stated that she objected to the decision, and T.L. never filed supplemental objections.

{¶ 44} "Under established authority, failure to raise a specific challenge to a magistrate's decision waives error other than plain error." *Scaccia v. Fid. Invests.*, 2d Dist. Greene No. 2018-CA-5, 2019-Ohio-50, ¶ 20, citing *Care Risk Retention Group v. Martin*, 191 Ohio App.3d 797, 2010-Ohio-6091, 947 N.E.2d 1214, ¶ 79-80 (2d Dist.). *See also In re N.Q.*, 2d Dist. Montgomery No. 25428, 2013-Ohio-3176, ¶ 67 (in parental termination case, failure to raise an issue in objecting to magistrate's decision waives error other than plain error).

{¶ 45} "In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus. No such circumstances appear here.

{¶ 46} "R.C. 2151.413 sets forth guidelines for determining when a public children-services agency or private child-placing agency must or may file a motion for permanent custody," and "R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 8 and 9. The juvenile court's findings must be supported by clear and convincing evidence. *In re J.N.*, 2d Dist. Montgomery No. 28247, 2019-Ohio-1800, ¶ 13.

{¶ 47} "Clear and convincing evidence is that measure or degree of proof which is

more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. In permanent custody cases, "[w]e apply an abuse-of-discretion standard, and we will not disturb such a decision on evidentiary grounds 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.' " *In re J.M.*, 2d Dist. Montgomery No. 28201, 2019-Ohio-1670, ¶ 4, quoting *In re L.C.*, 2d Dist. Clark No. 2010-CA-90, 2011-Ohio-2066, ¶ 14.

{¶ 48} As pertinent here, "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child." R.C. 2151.413(D)(1). There is no question that this provision was satisfied, because R.S.J. was in MCCS's custody from March 29, 2017 (when the court gave the agency temporary custody) though January 28, 2019 (when the agency filed its motion for permanent custody).

{¶ 49} Once the "12 of 22 months" ground has been satisfied, the agency only needs to prove that permanent custody is in the child's best interest. *J.N.* at ¶ 13. Under R.C. 2151.414(D), the court is "to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial

history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15.

{¶ 50} Turning to T.L.'s first argument, we do not agree that MCCS was required to evaluate her as a placement. "Consideration of placement of the child with a relative is not a statutory requirement. That possibility is a matter that ought to be considered in connection with the child's interaction and relationship with the child's parents, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child." *In re F.C.*, 2d Dist. Montgomery No. 23803, 2010-Ohio-3113, ¶ 24, citing R.C. 2151.414(D)(1)(a) and *In re C.W.*, 2d Dist. Montgomery No. 20140, 2004-Ohio-2040.

{¶ 51} R.C. 2151.414(D)(1)(a) concerns consideration of "[t]he interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." After discussing the history of the case and the evidence elicited at the hearing, the juvenile court found, in pertinent part, that:

> The child's paternal grandparents were discounted in placements
> after making numerous calls to the Agency and making posts to social
> media that the caseworker deemed threatening or inappropriate. The

paternal grandparents have not had contact with the child after this case was initiated. Paternal great grandmother [T.L.] was added as a party to this case in December 2018. Although [T.L.] would contact the caseworker to inquire about the child in the weeks leading up to the hearing, [T.L.] has not had any contact with this child since the case was initiated. [T.L.] doubts that a bond exists between her and the child at this time. The Agency also noted concerns about [T.L.] as a caregiver after she testified that she regularly visits [Father] in jail and maintains a good relationship with the child's paternal grandparents.

Judge's Final Appealable Order, p. 9. In discussing whether placement could be made without a grant of permanent custody, the court further stated that MCCS was not legally required to consider the paternal great-grandmother, and that "at the time of the custody hearing, T.L. herself doubted that a bond exist[ed] between herself and the child after not seeing him in over two years." *Id*. at p. 10.

{¶ 52} The juvenile court's observations were well-supported by the record. During the permanent custody hearing, T.L. indicated that R.S.J. had no bond with her, that she was a stranger to him, and that her house would be a strange location, as he had never seen it. Tr. p. 148-149. Adding to the points the court made, we note that T.L. did not have a significant relationship with R.S.J. even before he was removed from Mother's custody.

{¶ 53} In testifying at a hearing on the custody motion that T.L. filed in March 2018, T.L. indicated that she had had very limited contact with R.S.J., had not provided child care, and had not kept him overnight. At the permanent custody hearing, T.L. made

similar statements, including that she had never babysat for R.S.J. and had never changed his diaper. The GAL was also concerned about T.L.'s ability to protect the child, as she had been complicit in allowing Father to be around B.F. GAL Report (Oct. 31, 2017), p. 3.

{¶ 54} Given the above facts, the juvenile court did not commit plain error, let alone any error, for refusing to let T.L. work with MCCS to obtain legal custody. Accordingly, the First Assignment of Error is overruled.

### III. Best Interest of the Child

{¶ 55} T.L.'s Second Assignment of Error states that:

The Trial Court's Overruling of Appellant's Motion for Legal Custody

Was Unsupported by the Evidence and Was Contrary to the Best Interests

of the Child.

{¶ 56} Under this assignment of error, T.L. essentially reiterates what she has previously said. This time, however, T.L. focuses on three specific factors: R.C. 2151.414(D)(1)(a) (interrelationship with relatives); R.C. 2151.414(D)(1)(c) (custodial history, which T.L. claims was not her fault); and R.C. 2151.414(D)(1)(d) (the child's need for a legally secure placement). Again, before we address these points, we stress that our review is only for plain error. *Scaccia*, 2d Dist. Greene No. 2018-CA-5, 2019-Ohio-50, at ¶ 20; *N.Q.*, 2d Dist. Montgomery No. 25428, 2013-Ohio-3176, at ¶ 67. As we said previously, this is not the exceptional case warranting the application of plain error. *Goldfuss*, 79 Ohio St.3d 116, 679 N.E.2d 1099, at syllabus.

{¶ 57} Again, T.L.'s argument is basically that she was not given an opportunity to

build a bond with R.S.J., even though the juvenile court allowed her to become a party to the case. T.L. also argues that placement with relatives is preferable to foster care, that her home is appropriate, and that she should have been considered for placement.

{¶ 58} In granting permanent custody to MCCS, the juvenile court made the following comments: R.S.J. had been in his current foster home since he was taken into custody; he appeared well-adjusted and well cared-for; he was bonded to the foster parents; the home was a foster-to-adopt placement; and the foster family wished to adopt. Judge's Final Appealable Order, at p. 9-10. The record well-supports these facts. *See* Tr. p. 7, 9, 13, 16-17, and 44.

{¶ 59} Concerning the second point, the MCCS caseworker did not say relative placements were preferred; he said they would be preferred if there were "an appropriate placement." Tr. p. 63. This is an important distinction. Here, the agency did explore the child's relatives, but there was no appropriate placement. Tr. p. 23, 24, 26, 60, 62, and 75-76.

{¶ 60} Finally, T.L. argues that she was not at fault for the child's having been in temporary custody for over two years because she had been trying to make herself available for placement since June 2017. However, R.C. 2151.414(D)(1)(c), which requires courts to consider custodial history, is not a fault-based provision. It merely requires courts to consider the custodial history, with an emphasis on whether a child has been in custody for 12 of the last 22 months. Presumably this is because that time period is one of the conditions listed in R.C. 2151.414(B)(1)(a) that allow courts to avoid the additional requirement in R.C. 2151.414(B)(2) of finding that "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either

parent."

**{¶ 61}** As indicated in our discussion of the First Assignment of Error, ample evidence supported the finding that awarding permanent custody to MCCS was in the best interest of R.S.J. Accordingly, the Second Assignment of Error is overruled.

## IV. Conclusion

**{¶ 62}** Both of T.L.'s assignments of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Mark A. Fisher
Theodore Valley
Jacob Kovach, GAL
K.M.
Hon. Helen Wallace